IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:25-cv-488

| | |
|---|---|
| CLIFFORD ILDERTON and SARA ILDERTON, <br><br> Plaintiffs, <br><br> v. <br><br> STATE FARM FIRE AND CASUALTY CO., <br><br> Defendant. | COMPLAINT <br> (Jury Demand) |

Plaintiffs Clifford Ilderton and Sara Ilderton, for their Complaint against Defendant State Farm Fire and Casualty Company ("State Farm"), allege as follows:

## INTRODUCTION

1. This is an insurance coverage dispute, seeking damages arising from State Farm's dogged year-and-a-half-long campaign to avoid paying what it owes the Ildertons under the couple's State Farm Homeowner's Policy (the "Policy") after a large tree crashed into their home, causing catastrophic damage.

2. State Farm has managed to avoid paying the Ildertons what it owes them under the Policy by, among other things, (i) assigning unqualified adjusters; (ii) cycling adjusters on and off the claim; (iii) requiring that the Ildertons change contractors; (iv) keeping the claim "under review" for months at a time; (v) going weeks without responding to the Ildertons about the status of the claim; (vi) repeatedly agreeing with Ildertons' contractor's assessment of the work required to repair the home, only to renege on those agreements; (vii) egregiously mischaracterizing the nature and scope of the required work; and (ix) making it impossible for the Ildertons—even with

1

the help of an experienced public adjuster—to track what repairs State Farm agrees are covered under the Policy and what it apparently has declined to cover.

3. Through this Complaint, the Ildertons seek redress of their injuries caused by State Farm's unlawful conduct.

**PARTIES, JURISDICTION, AND VENUE**

4. The Ildertons are citizens and residents of Mecklenburg County, North Carolina.

5. State Farm is an Illinois corporation engaged in the business of insurance, with its principal place of business located at One State Farm Plaza, Bloomington, IL 61710.

6. Upon information and belief, State Farm is a duly licensed insurance company, authorized and qualified to do business in the state of North Carolina.

7. At all times relevant to this action, the Ildertons were insured under the Policy.

8. This Court has specific and general personal jurisdiction over State Farm because State Farm issued the Policy in North Carolina to provide coverage to the Ildertons, North Carolina residents, and because State Farm regularly and systematically engages in the business of insurance in North Carolina.

9. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs, and the parties are citizens of different states.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

### The Ildertons File a Claim Under the Policy

11. The Ildertons purchased the Policy from State Farm to protect themselves against the financial burden of paying to repair or rebuild their family home and replace their personal belongings should an unexpected disaster strike.

12. The Policy Number is 33-BV-H100-3. The Policy is effective July 22, 2023 to July 22, 2024. A copy of the Policy in substantial form is attached as Exhibit A.

13. On January 9, 2024, a large tree fell on the Ildertons' home in a windstorm, causing extensive structural damage and rendering the home uninhabitable. The tree crushed the roof, kitchen, and deck. Rainwater destroyed electrical work and flooring throughout the house. The combined impact of the fallen tree and water intrusion badly damaged the foundation and destroyed many of the Ildertons' furnishings and other personal belongings.

14. On or about January 10, 2024, the Ildertons notified State Farm of their claim under the Policy. State Farm issued the Ildertons a check for $10,000 to remove the tree; mitigate ongoing damage to the house from water intrusion, including covering the roof with a temporary tarp; and perform emergency electrical work, including replacing the damaged meter.

### The First State Farm Adjuster

15. On or about January 11, 2024, the Ildertons requested a quote from Andrew Roby, an experienced and well-respected contractor, to perform the repairs to their home.

16. On January 17, 2024, Roby performed emergency electrical work.

17. On January 19, 2024, Envista Forensics inspected the Ildertons' home to determine the extent of the structural damage, at the request of State Farm. It provided State Farm with a

3

Case 3:25-cv-00488-MOC-SCR     Document 1     Filed 07/07/25     Page 3 of 20

written report on January 26, 2024, detailing extensive damage to the upper- and middle-level roof framing, kitchen and rear exterior wall framing, and rear deck framing.

18. On or about January 21, 2024, a State Farm adjuster provided the Ildertons with an estimate of the scope of damages and cost of repairs, which is the amount State Farm calculated that it owed the Ildertons to repair their home under the Policy.

19. Generally, upon providing a carrier estimate, State Farm will issue a payment in the amount of the carrier estimate, less depreciation, but withhold advances until repairs or replacement is complete. A contractor provides a certificate of completion to verify that restoration work has been completed. A homeowner separately may submit a proof of purchase for personal property replacement.

20. A homeowner often uses the carrier estimate and associated payments to retain contractors and other tradesmen, most of whom will not agree to assume the financial risk of a large project like the Ildertons' without an accurate and complete carrier estimate, and often require a substantial deposit.

21. In this first carrier estimate, State Farm calculated that it owed the Ildertons less than $40,000. A few weeks later, on February 12, 2024, the adjuster sent the Ildertons a revised estimate of just $63,606.47.

22. When the Ildertons expressed alarm that these estimates grossly understated the cost of the repairs necessary to restore their house and belongings, the State Farm adjuster assured the couple that these estimates were not final, but were only intended to give them a little money "to get them started." The State Farm adjuster further assured the couple that State Farm would revise the estimate to cover the full cost of the repairs covered by the Policy. These statements proved to be misrepresentations.

4

23. On or about March 18, 2024, Andrew Roby submitted an estimate for the cost of the work to repair the house to State Farm. The contractor estimated that it could complete the repairs to the Ildertons' home in three months.

24. On or about March 22, 2024, the Ildertons submitted an inventory of personal property loss for reimbursement totaling approximately $22,000.

25. On or about April 5, 2024, more than three weeks after Andrew Roby submitted the contractor estimate, the State Farm adjuster informed the Ildertons that State Farm would not accept any contractor estimate that did not use a software program called Xactimate, a condition the Policy nowhere specifies.

26. Andrew Roby did not use Xactimate, which is complex, not user-friendly, and requires specialized expertise to use.

27. The Ildertons were forced to find another contractor who could submit a contractor estimate using Xactimate. This condition, coupled with State Farm's grossly inadequate carrier estimate, made it nearly impossible for the Ildertons to find a reputable contractor who was willing to undertake the financial risk of such a large project.

28. The Ildertons ultimately engaged Total Roofing Solutions (or the "Contractor"). The Contractor was willing to consult with third parties to create an estimate in Xactimate. The Contractor also estimated that he could complete the work in around three months.

29. In mid-April, 2024, the Contractor, using funds tied to the earlier estimate, was finally able to begin demolition work to explore the extent of the damage. Portions of the house had been water-damaged for months, and the Contractor explained to the State Farm adjuster that demolition would inform the scope of repair. The demolition revealed additional structural damage to the Ildertons' home.

30. On May 5, 2024, the Ildertons engaged Carolina Claims Consulting ("CCC"), a public adjuster, to help them navigate the claims process because of State Farm's deficient and dilatory handling of their claim.

31. On or about May 10, 2024, CCC spoke to the State Farm adjuster on behalf of the Ildertons. The State Farm adjuster was only authorized to approve claims up to about $50,000, and the size of the Ildertons' claim dwarfed that amount. Thus, CCC requested that State Farm assign a certified large loss adjuster to the claim, who would have the training and experience to process large, complex property damage claims, like the Ildertons' claim. The adjuster denied the request for a large loss adjuster.

32. On this call, CCC expressed concern about the incomplete carrier estimate. The adjuster reiterated that the current carrier estimate was only intended to enable the couple to begin the repairs and that State Farm would revise the estimate to cover the full cost of the repairs covered under the Policy.

33. Meanwhile, a property claims estimation consultant helped the Contractor build an estimate in Xactimate. CCC retained the consultant solely for this purpose.

34. On May 20, 2024, CCC submitted the Contractor's estimate using Xactimate. It estimated the cost to repair the Ildertons' home was at least $347,683.95.

35. On June 14, 2024, the State Farm adjuster conducted an onsite inspection. During the inspection, the Contractor showed the State Farm adjuster the damage to the house and thoroughly explained the repairs required to fix the damage identified to date. The Contractor also explained that as work progressed, additional structural damage may be uncovered.

36. During this onsite inspection, the Contractor went through each item of the Contractor Estimate and showed the State Farm adjuster the basis for each item. The adjuster orally agreed that each of these repair items identified by the Contractor were necessary.

37. The adjuster suggested that his supervisor would require more documentation to approve such extensive damages because the supervisor would not have seen the damage in person. Thus, the adjuster suggested that the repairs should proceed in stages. He stated that he could immediately approve all repairs to the exterior of the home. He also stated that he would approve the extensive electrical repairs. The adjuster suggested that, after the Contractor completed the exterior and electrical repairs, it should submit photographs to State Farm to document the additional required interior repair work.

38. At the walkthrough, the State Farm adjuster promised that he would send the Ildertons a revised carrier estimate and encouraged the Contractor to complete the work.

39. Over the next several weeks, CCC and the Ildertons emailed the State Farm adjuster about the status of the revised carrier estimate that the adjuster had promised, noting that the Contractor was ready to move forward with the work. The adjuster merely acknowledged receipt of their email or responded that the claim was in the "review process."

40. The Contractor soon exhausted the funds from the early estimate—the last payment that State Farm issued to fund repairs had been in mid-February. The Contractor continued to work on the Ildertons' home, but eventually the deficit grew so large that the Contractor was forced to stop work. Work could not resume until State Farm provided a revised carrier estimate and issued an accompanying payment.

### The Second State Farm Adjuster

41. In mid-July, State Farm reassigned the first adjuster, and a new adjuster took over management of the Ildertons' claim.

42. On July 19, 2024, the second State Farm adjuster finally submitted an updated estimate—more than a full month after the first State Farm adjuster agreed with the Contractor's explanation of the scope of work during the onsite inspection. CCC would later learn that the second adjuster did not create this estimate, but merely submitted an estimate that his predecessor had created.

43. This carrier estimate was for just $157,153.81, less than half the Contractor estimate, which the first State Farm adjuster had agreed was necessary during the onsite inspection.

44. The revised carrier estimate was incomplete and replete with obvious inaccuracies. Despite State Farm's insistence that the Contractor submit claims using Xactimate, which breaks out each line item of the estimate in extraordinary detail, State Farm's carrier estimate did not correspond with the line items in the Contractor's estimate—making it nearly impossible to reconcile the two estimates and understand what items from the contractor estimate State Farm agreed were covered under the Policy.

45. Adding to the confusion, State Farm failed to identify the items from the contractor estimate that it excluded from its estimate and failed to cite specific language from the Policy justifying the denial as required by 11 N.C. Admin. Code 4.0117. Thus, not even CCC and the Contractor, each of which had substantial expertise and experience navigating the claims process, could understand whether State Farm had denied coverage of these items and, if so, on what basis.

46. On July 24, 2024, CCC spoke with this second State Farm adjuster. The second adjuster explained that the July 19 estimate was created, but not submitted, by the first adjuster. The adjuster agreed to discuss the claim with CCC after he had reviewed the Ildertons' claim file.

47. With the partial payment State Farm made to the Ildertons in connection with the July 19 estimate, the Contractor resumed work on their home. The Ildertons, meanwhile, were displaced from their home and had to stay in rental housing.

48. On August 2, 2024, CCC spoke with the second State Farm adjuster. He requested additional documentation and stated that he was still "getting up to speed."

49. On August 5, 2024, CCC provided the second State Farm adjuster with all documents associated with the Ildertons' claim because he still had not reviewed the file.

50. On or about August 7, 2024 the second adjuster called the Ildertons, despite repeated requests to communicate with CCC, and told them that he was authorized to approve up to $1,000,000 in claims, implying that he was a large loss adjuster.

51. After this call, CCC emailed the adjuster to request that he provide verification that he was a large loss adjuster. The adjuster did not respond to CCC's email.

52. Instead, on or around August 8, 2024, the second State Farm adjuster called CCC. He admitted that he was not a certified large loss adjuster. CCC requested that State Farm assign a large loss adjuster to the claim. The adjuster answered that State Farm does not use large loss adjusters, which is false.

53. On August 30, 2024, the Contractor led the second State Farm adjuster through an onsite inspection, at the adjuster's request. The second State Farm adjuster agreed with the full scope of work except the paver and deck repair estimates. Like the first State Farm adjuster, he

9

promised to send a revised estimate promptly and strongly encouraged the Contractor to continue the repairs.

54. On or about September 9, 2024, CCC spoke with the second State Farm adjuster's supervisor because he still had not provided an updated estimate reflecting his agreement with the scope of work during his onsite inspection. The supervisor promised that State Farm would send the revised estimate by September 13.

55. On September 16, 2024, the second adjuster explained that his review was delayed because the total claim was significantly larger than State Farm's initial estimates, which—as noted—State Farm's adjusters had confirmed were artificially low and designed to serve as a placeholder that allowed work to begin.

56. Despite the promises of the second State Farm adjuster and his supervisor to provide an updated carrier estimate promptly and repeated emails and phone calls from the Ildertons and CCC requesting an update on the status of the estimate, the second State Farm adjuster did not send the Ildertons an updated estimate until October 16, almost three months after he had been assigned the claim and a month and half after he had agreed to the scope of work during his onsite inspection.

57. Like the previous estimates, this carrier estimate was incomplete and obviously inaccurate. Also, like the previous estimate, it did not respond to the line items in the contractor estimate, did not indicate that it actually had denied coverage of any item excluded from its estimate, and did not cite exclusionary language in the Policy justifying the denial as required under North Carolina law.

58. On or about October 23, 2024, the second State Farm adjuster called the Ildertons to discuss their personal property inventory. He called them directly, despite repeated

instructions that State Farm direct all communications to CCC. The Ildertons agreed to meet with the adjuster later that day.

59. The second adjuster arrived that afternoon with his supervisor. But instead of discussing the personal property inventory, they announced their intention to conduct a third onsite inspection.

60. The second State Farm adjuster and his supervisor asked the Ildertons detailed questions about the damage and repairs, which should have been directed to the Contractor and CCC.

61. The Ildertons, increasingly uncomfortable, called the Contractor and CCC, who arrived onsite shortly thereafter and answered State Farm's questions.

62. At the conclusion of the surprise inspection, the second State Farm adjuster and his supervisor promised that they would promptly provide an updated carrier estimate.

63. On October 25, 2024, Mr. Ilderton emailed the adjuster to ask that State Farm pay their personal property claim. Mr. Ilderton requested that the adjuster respond in writing and include CCC on the correspondence.

64. However, the adjuster called Mr. Ilderton directly that afternoon, informing him that he would send their personal property claim, which the Ildertons had submitted to State Farm seven months earlier, to the team that was in charge of reviewing personal property claims.

65. On or about November 15, 2024, the second State Farm adjuster called the Ildertons to inform them that he and his supervisor would no longer be assigned to their claim. Neither the second adjuster nor his supervisor had provided the promised updated carrier estimate, nor had they issued promised payments for any of the Ildertons' personal property losses.

66. On December 6, 2024, counsel for the Ildertons sent a letter to State Farm explaining the deficiencies in the claims process and demanding that State Farm assign a large loss adjuster to the Ildertons' claim, extend the Ildertons' temporary housing allowance, reimburse the Ildertons for personal property losses, pay the full amount of the contractor estimate, and pay the public adjusting fees incurred through CCC. State Farm did not reply to this letter.

### The Third State Farm Adjuster

67. State Farm left the Ildertons without an adjuster for their claim for almost a full month.

68. Finally, on December 11, a third adjuster called CCC to explain that he just had been assigned to the Ildertons' claim that morning.

69. On or about December 15, 2024, the third adjuster provided the Ildertons with an updated carrier estimate for $211,883.43. The estimate was dated December 11, 2024—the day the third adjuster was assigned the Ildertons' claim. On information and belief, the second adjuster had created, but not submitted, this estimate. The estimate, like the preceding estimates, was incomplete and replete with inaccuracies. State Farm did not issue any additional payments in December.

70. In the meantime, money for the repairs again ran out. To get the Ildertons back into their home, the Contractor offered to purchase certain items out of its own funds and await a later reimbursement. The Ildertons finally were able to return to their home on December 31, 2025, almost a full year after the tree had crushed their house.

71. However, there was significant work still to be completed on the house, including repairs to the Ildertons' deck.

72. Moreover, in December, the Contractor had discovered water intrusion from stress cracks in the foundation due to the treefall. The Contractor solicited bids from foundation specialists to mitigate and repair this damage. Though the third adjuster has agreed that the foundation repairs are covered by the Policy, State Farm has yet to approve any of the specific bids for work required to seal and repair the foundation.

73. On December 30, 2024, the third adjuster told CCC that all claim submissions, other than the additional foundation issues, remained "in the review process." He offered no further explanation.

74. On January 9, 2025, State Farm issued a partial payment of $6,515.44 for the Ildertons' personal property losses, which amounted to just a third of the $22,000 claim they had submitted almost ten months earlier. State Farm did not explain which items this payment covered, whether it had denied coverage of items, or the basis of any denial.

75. Also on January 9, 2025, the third adjuster submitted another estimate. This estimate inexplicably decreased from the December 11 carrier estimate. On January 27 and March 3, the third adjuster submitted further revised carrier estimates, each still below the contractor estimate.

76. As the remaining work progressed, the Contractor and CCC repeatedly submitted individual bids, invoices, and photographs of work that had been completed and was still to be completed.

77. On January 15, 2025, CCC provided State Farm with a comprehensive summary of the damage to the Ildertons' home and the work required to repair it. CCC reattached the initial Xactimate estimate, which past adjusters failed to meaningfully review and address, along with individual invoices for subsequent work completed and bids for future work. CCC, again,

13

asked that State Farm explain any discrepancies between its estimate and the contractor estimates and bids.

78. On January 27, 2025, the third adjuster emailed a list of items "not warranted or excluded from the State Farm estimate." The list, which covered just a fraction of the discrepancies between the estimates, contradicted State Farm's past approvals and did not cite specific Policy language justifying the denials.

79. The Contractor attempted to reconcile the Ildertons' submissions with the carrier estimate, and CCC submitted this explanation on February 6, 2025.

80. By the time of the March 3 estimate, State Farm's carrier estimates had become almost indecipherable. The carrier estimate did not correspond to the estimates, bids, invoices, and other documentation that CCC had submitted.

81. For example, State Farm had agreed, during an onsite inspection, that hardwood floors needed to be replaced and told the Contractor to order the wood. The Contractor completed the repair, but the estimate does not reflect this, only listing a line item to sand and finish the floors.

82. As another example, the carrier estimate did not correspond to the correct materials used in the Ildertons' home. The estimates continued to list incorrect materials used in the countertops and cabinets, and included a line item to re-plaster the Ildertons' home—though the Contractor had, in fact, replaced drywall.

83. Upon information and belief, the State Farm adjusters would purposefully adjust a carrier estimate upward by inaccurately editing individual line items to inflate their cost, rather than by consulting with the Contractor's estimates, bids, or invoices. Thus, the estimate totals would incrementally increase, while the estimate contents increasingly diverged from the actual

14

work that was needed to repair the Ildertons' home, making it impossible to track which items State Farm agreed were covered under the Policy and what State Farm continued to avoid paying.

84. On April 24, 2025, CCC submitted an updated contractor estimate. The Contractor had previously submitted work covered in this estimate, contemporaneously with the work. As new work was needed, the Contractor would solicit bids, select a low bid, complete the work, and submit an invoice and photographs of the work to State Farm.

85. Although State Farm had not responded to the initial Xactimate estimate or updated bids and invoices, the Ildertons hoped that a comprehensive summation of the work completed (and a portion still to be completed) would help State Farm understand the estimate discrepancies. Thus, this estimate incorporated all of the earlier submissions into a single Xactimate estimate. This estimate totaled $481,637.05—$168,472.16 above State Farm's most recent March 3 estimate of $313,164.89.

86. State Farm has not, as of the date of this filing, responded to the updated contractor estimate. Nor has it updated its March 3 estimate.

87. Because State Farm continues to withhold owed funds, the Contractor cannot pay its subcontractors to complete the repairs on the Ildertons' home, including repairs to the foundation and deck. Thus, the work on the Ildertons' home remains incomplete 18 months after the tree fell.

## Remedics Payment

88. During this process, State Farm also failed to pay the company that performed the water remediation work necessitated by the initial water intrusion.

15

Case 3:25-cv-00488-MOC-SCR     Document 1     Filed 07/07/25     Page 15 of 20

89. Remedics performed this water remediation work in January 2024. Remedics also removed and stored the contents of the Ildertons' home during the remediation.

90. State Farm approved the scope of this remediation and storage work. As repairs to the Ildertons' property continued, and then stalled, State Farm approved additional months of storage for the contents of their home.

91. Despite these approvals and repeated inquiries from the Ildertons, CCC, and Remedics itself, State Farm issued delayed and incomplete payments to Remedics.

92. State Farm has not, as of the day of this filing, paid Remedics's invoice for the storage of the Ildertons' belongings in October and November, which is equal to $5,906.40.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

93. The Ildertons incorporate the allegations of all preceding paragraphs.

94. The Policy is a valid and enforceable contract under North Carolina law.

95. The Policy requires State Farm to promptly pay the Ildertons to repair damage to their home and personal belongings covered under the Policy.

96. By failing to pay the benefits owed to the Ildertons under the Policy as described in this Complaint, State Farm materially breached its obligations under the Policy.

97. As a direct and proximate result of State Farm's material breaches of the Policy, the Ildertons have been damaged and deprived of the benefits their premium dollars purchased.

98. The Ildertons are entitled to recover, as damages for State Farm's breach of contract, compensatory damages, including the benefits promised under the Policy.

99. The total amount of damages for which State Farm is liable upon this claim is an amount in excess of $75,000.

16

## SECOND CLAIM FOR RELIEF
### (Violations of N.C. Gen. Stat. §§ 58-63-15(11) and 75-1.1)

100. The Ildertons incorporate the allegations of all preceding paragraphs.

101. The North Carolina Unfair Claims Settlement Practices statute, N.C. Gen. Stat. § 58-63-15(11), outlaws certain specified conduct by insurers and their agents in relation to the investigation, adjustment and payment of claims for insurance coverage. A violation of the statute constitutes a *per se* violation of the North Carolina Unfair and Deceptive Trade Practices Act. N.C. Gen. Stat. § 75-1.1 *et seq*.

102. The conduct of State Farm described in this Complaint violated N.C. Gen. Stat. § 58-63-15(11). State Farm's unfair, deceptive, unethical, unscrupulous, improper, and unlawful actions and practices include but are not limited to:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof-of-loss statements have been completed;

…

(j) Making claims payments to insureds . . . not accompanied by [a] statement setting forth the coverage under which the payments are being made;

>   …
>
>   (l)     Delaying the investigation or payment of claims by requiring an insured claimant . . . to submit a preliminary claim report and then requiring the subsequent submission of formal proof-of-loss forms, both of which submissions contain substantially the same information;
>
>   …
>
>   (n)     Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement

N.C. Gen. Stat. § 58-63-15(11) (alterations in original). Each of these statutory violations constitutes a *per se* violation of N.C. Gen. Stat. § 75-1.1.

103. State Farm's actions were in and affecting commerce and proximately caused injury to the Ildertons.

104. As a direct and proximate result of State Farm's statutory violations, the Ildertons have sustained actual damages in excess of $75,000.

105. Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, the Ildertons are entitled to recover treble damages and attorneys' fees.

### THIRD CLAIM FOR RELIEF
### (Tortious Bad Faith Refusal to Settle)

106. The Ildertons incorporate the allegations of all preceding paragraphs.

107. State Farm has recognized the validity of the Ildertons claim under the Policy. Nonetheless, it has refused to pay the amounts due under the Policy.

108. State Farm assigned unqualified adjusters to the Ildertons' claim, proffered grossly inadequate payment estimates, caused the Ildertons to submit estimates that State Farm would not

18

review, and inordinately delayed both the settlement and the Ildertons' return to their home. This conduct, including State Farm's conduct as described in this Complaint, constitutes bad faith and aggravating or outrageous conduct.

109. As a direct and proximate result of State Farm's bad faith refusal to settle, the Ildertons have sustained damages in excess of $75,000.

**FOURTH CLAIM FOR RELIEF**
**(Declaratory Relief)**

110. The Ildertons incorporate the allegations of all preceding paragraphs.

111. The Ildertons plead the terms of the Policy as if fully set forth herein.

112. The Ildertons seek a determination from this Court of State Farm's coverage obligations to the Ildertons for the loss they sustained due to a treefall in a windstorm on January 9, 2024 in the amounts submitted by the Ildertons and their contractors.

**REQUEST FOR RELIEF**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiffs request trial by jury and that this Court enter judgment in its favor and award Plaintiffs:

1. A declaration that State Farm owes a duty under the Policy to pay the Ildertons for all damages sustained to their property due to the treefall of January 9, 2024, in the amounts submitted by the Ildertons and their contractors for repairs already completed;

2. A declaration that State Farm owes a duty under the Policy to pay the Ildertons for damages sustained to their home and property due to the treefall of January 9, 2024, in the amounts that will be submitted by contractors for repairs that must still be completed;

3. actual, consequential, compensatory, and other like damages, in an amount in excess of $75,000;

4. punitive damages pursuant to the Fourth Claim for Relief to the greatest extent permitted by law;

5. treble damages pursuant to N.C. Gen. Stat. § 75-16;

6. all costs, interest, and attorneys' fees;

7. pre- and post-judgment interest; and

8. such other and further relief as this Court deems just and proper.

This the 7th day of July 2025.

        s/ David C. Wright, III
        David C. Wright, III
        N.C. Bar No. 11161
        dwright@robinsonbradshaw.com

        Margaret R. McLoughlin
        N.C. Bar No. 60438
        mmcloughlin@robinsonbradshaw.com

        **ROBINSON, BRADSHAW & HINSON, P.A**.
        600 South Tryon Street, Suite 2300
        Charlotte, North Carolina 28202
        Telephone: (704) 377-2536
        Facsimile: (704) 378-4000

        *Attorneys for Plaintiffs*